UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**TERESA JONES,**

    **Plaintiff,**

v.                                              Case No. 8:16-cv-2882-T-30TBM

**LIFE INSURANCE COMPANY**
**OF NORTH AMERICA,**

    **Defendant.**
_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the Court on referral from the Honorable James S. Moody for a Report and Recommendation on:

(1) **Plaintiff's Motion for Summary Judgment** (Doc. 24), Defendant's response in opposition (Doc. 31), and Plaintiff's reply (Doc. 37); and

(2) **Defendant's Motion for Summary Judgment** (Doc. 25), Plaintiff's response in opposition (Doc. 32), and Defendant's reply (Doc. 38).

Defendant submitted the administrative record on CD (*see* Doc. 15)[1], and the parties submitted a Stipulation Regarding the ERISA Standard of Review (Doc. 23).

For the reasons set forth below, I recommend Plaintiff's motion (Doc. 24) be denied and Defendant's motion (Doc. 25) be granted.

**I.**

---

[1]Citations to the administrative record are denoted as R. followed by the page number.

**Background**

Plaintiff's Complaint sets for the essential and largely undisputed facts surrounding Norman Jones' (hereinafter "Mr. Jones" or the "Decedent") injuries sustained while on business in Mexico. Mr. Jones was employed by Siemens Corporation as an engineer. (Doc. 1 at ¶ 24). On October 7, 2015, after arriving in Mexico for business, he tripped and lost his balance while entering his hotel, causing him to fall forward and strike his face on steps leading up into the lobby. *Id.* at ¶¶ 25–28. He suffered facial injuries, including bone fractures to his nose and eyes, and was taken to a hospital. *Id.* at ¶¶ 30–33. On October 8, Mr. Jones was cleared by cardiology and received reconstructive surgery at a local hospital. *Id.* at ¶ 35. In pre-op assessment, a cardiologist noted a 2% "risk of death" and an 11% "risk of major complications." *Id.* at ¶ 36. The risk of thromboembolism was rated high, at 40–80% risk, therefore anti-clotting measures were implemented. (R. 67). He underwent reconstructive surgery on October 8, 2017, without complications. *Id.* at ¶ 39. Approximately three days after the fall and thirty hours after the surgery, on October 10, 2015, Mr. Jones became unresponsive and died. *Id.* at ¶¶ 42–43. A Death Certificate from the Mexican hospital listed "pulmonary thromboembolism" as the cause of death. Facial trauma was identified as a contributing factor. Id. at ¶¶ 45-46. No autopsy was performed. *Id.* at ¶ 44.

Plaintiff Teresa Jones, the Decedent's spouse and beneficiary, submitted a claim for accidental death and dismemberment benefits under Group Accident Policy ABL-633174 ("the Policy") on October 30, 2015. (R. 405–06).

The Policy provides, in pertinent part:

> Coverage A: Accidental Death And Dismemberment Benefit--We will pay this benefit if:

> a) a person is injured by one of the types of accidents described in Schedule IV, which happens while he is covered by this policy; and
> b) he suffers one of the losses listed below as a direct result of the injuries, and from no other cause, within a year of the accident.

(R. 428).

Under "Exclusions," the Policy states: "This is an Accident Only policy. We will not pay benefits for loss caused by or resulting from illness, disease, or bodily infirmity." (R. 429).

Upon review of the claim, Defendant Life Insurance Company of North America ("LINA") determined that Mr. Jones's death was not a covered loss under the policy. (R. 142–46). Cigna, on LINA's behalf, explained:

> Documentation received and reviewed supports that Norman Jones died on 10/10/2015. The records support that Mr. Jones fell on steps on 10/7/2015 and suffered trauma to his face, for which he underwent surgery. However, his medical records indicate a history of extensive heart disease, chronic atrial fibrillation and obesity. The records support that these pre-existing medical conditions significantly contributed to his death.
> Policy ABL 633174, as previously quoted, "is an accident only policy. It does not pay benefits for loss caused by sickness." The policy offers benefits to eligible persons "who, as a direct result of the injuries, and from no other cause, suffer a covered loss." Given that Norman Jones' death was not a direct result of the fractures of his nose, but was primarily caused by complications of his chronic heart disease, the loss is not compensable under this policy.

(R. 145).

Mrs. Jones appealed (R. 93–99), and LINA denied the appeal. (R. 6–16).

Thereafter, pursuant to the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, Mrs. Jones filed suit against LINA seeking judicial review and alleging wrongful denial of accidental death insurance benefits. (*See* Doc. 1). In brief, she

3

claims Cigna, the parent company of LINA and the claims administrator under the Plan, improperly denied benefits in the amount of $325,000. She seeks damages for the unpaid benefits, pre-judgment interest, costs, and attorneys fees. *Id.*

The parties submitted cross-motions for summary judgment, which are now ripe for review.

## II.

## Standard of Review

In accordance with Federal Rule of Civil Procedure 56, summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Fennell v. Gilstrap*, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1356 (11th Cir. 2007)). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Evidence is reviewed in the light most favorable to the non-moving party. *Fennell,* 559 F.3d at 1216 (citing *Welding Servs., Inc.,* 509 F.3d at 1356).

ERISA benefit denial cases implicate additional considerations of the appropriate standard of review. The Eleventh Circuit has explained:

> ERISA provides no standard for reviewing decisions of plan administrators or fiduciaries. However, the Supreme Court in [*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989),] established three distinct standards for reviewing an ERISA plan administrator's decision: (1) de novo where the plan does not grant the administrator discretion; (2) arbitrary and capricious where the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where the plan grants the

4

> administrator discretion and the administrator has a conflict of interest.

*Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010) (citations omitted).

As stipulated to by the parties, the standard of review in this case is *de novo*. (*See* Doc. 23). The Policy at issue here does not include a grant of discretionary language necessary for the more deferential arbitrary and capricious standard of review.

Under the *de novo* standard, the court asks:

> (1) whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is *"de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

*See Capone* at 1195.

*De novo* review employs a high level of scrutiny and does not give judicial deference to the decision to deny benefits. *Williams v. BellSouth Telecommunications*, Inc., 373 F.3d 1132, 1137 (11th Cir. 2004) (overruled on other grounds by *Blankenship v. Metropolitan Life Ins. Co.*, 644 F. 3d 1350 (11th Cir. 2011); *see also HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 993 n.23 (11th Cir. 2001) (noting "'[w]rong' is the label used by our precedent to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the plan administrator's plan interpretation"). A court must "stand in the shoes of the administrator and start from scratch, examining all the evidence before the administrator as if the issue had not been decided previously." *Stiltz v. Metro. Life Ins. Co.*, 2006 WL 2534406, at *6 (N.D. Ga. Aug. 30, 2006), aff'd, 244 F. App'x. 260 (11th Cir. 2007). And, while judicial review in ERISA cases is

generally limited to the administrative record, "*de novo* review permits the parties to put before the district court evidence beyond that which was presented to the administrator at the time the denial decision was made." *Shaw v. Connecticut General Life Ins. Co.*, 353 F.3d 1276, 1284 n.6 (11th Cir. 2003) (citing *Moon v. Am. Home Assur. Co.*, 888 F.2d 86, 89 (11th Cir. 1989) ("American Home's contention that a court conducting a de novo review must examine only such facts as were available to the plan administrator at the time of the benefits denial is contrary to the concept of a de novo review.")); *see also Kirwan v. Marriott Corp.*, 10 F.3d 784, 789 (11th Cir. 1994).[2]

### III.

### Summary of Arguments

By Plaintiff's motion (Doc. 24), she argues summary judgment is appropriate in her favor because, in essence, the benefits-denial decision is "wrong." By her argument, the medical evidence reveals Mr. Jones' heart condition did not substantially contribute to this death. Rather, she asserts, "It was the cascade of events stemming from crushing his face in the fall that caused his death."[3] (Doc. 23 at 11). Citing the Eleventh Circuit's seminal case *Dixon v. Life Ins. Co. of Amer.*, 389 F. 3d 1179 (11th Cir. 2004), in which the Court adopted the "substantial contribution" test, she acknowledges that death must be a direct result of the injuries, but urges that a direct result need not be immediate and may be "a downstream result." She asserts that unlike in *Dixon*, where there was no evidence of external injury, here it is undisputed there was

---

[2]Neither party has attempted to present evidence to expand the administrative record in this case or to present evidence that was unavailable at the time of the denial.

[3]In large measure, she relies upon the report of her own forensic pathologist, Daniel Schultz, M.D. (R. 23–27).

6

external injury and that a direct chain of events occurred that lead to Mr. Jones's death—the fall, the facial trauma, the surgery, and his death. While she concedes that Mr. Jones had a history of cardiac disease, she claims his preexisting conditions were not acute, not actively problematic, and under control,[4] and that by the hospital's assessment his risk of death going into surgery was 2% and risk of major cardiovascular complications was 11%. She claims the traumatic, physical injuries to Mr. Jones' face that heavily stressed his body systems is a dispositive fact distinguishing this case from *Dixon* and its progeny. She argues, "But for the fall, Mr. Jones would not have been hospitalized that day at that time. But for the fall, he would not have to have surgery. But for the fall, the physiologic stress on his system[,] he would not have had post-surgical complications and would not have had a pulmonary embolism that caused his death." Thus, she claims based on the evidence in the record it cannot be concluded that Mr. Jones' underlying cardiovascular disease was more than a *de minimis* contributing factor in his death; rather "it was his significant physical injuries that required surgery that substantially contributed to his death."

With regard to the medical opinion evidence of record, Plaintiff claims three doctors provided opinions as to the cause of Mr. Jones' death, but only LINA's non-examining physician, Dr. Denton, failed to explain his rationale for the conclusion that Mr. Jones' death was wholly "unrelated to the fall and surgery" and "most likely" related to his heart disease. In contrast, she points out that the Mexican plastic surgeon who pronounced Mr. Jones dead provided the

---

[4]She notes that Mr. Jones visited his cardiologist six days before traveling to Mexico. The doctor noted a history of "hypertension, atrial fibrillation, and cardiomyopathy," but stated he "has been doing pretty well since his last visit" and had "no chest pain, lightheadedness, or other concerning symptoms." (R. 163).

information for the official death certificate and opined the cause of death was pulmonary embolism contributed to by facial trauma. And, she claims that forensic pathologist Dr. Daniel Shultz provided a well-reasoned opinion that the traumatic event of his facial injuries and the physiologic stress on his system that was too much for his system to endure caused the post-surgical complications that directly caused his death. Given such evidence, she claims the facts of this case do not warrant a finding that Mr. Jones' preexisting conditions substantially contributed to his death, as such should be interpreted under Eleventh Circuit precedent.

By Defendant's cross-motion (Doc. 25), it argues Mr. Jones had an extensive medical history of systemic arterial hypertension, atrial chronic fibrillation, and ischemic cardiopathy disease, which were the immediate, primary, and most reasonable cause of his death. Citing the Death Certificate, it urges the injuries sustained in the fall contributed to death but were unrelated to the morbid state that caused it. As such, it argues that LINA's denial of the claim is supported in two respects: first, Mr. Jones' death did not result "directly" from the fall as required by the Policy; and, second, his death is not covered under the Policy's Illness Exclusion. Defendant asserts it is Plaintiff's burden to show Mr. Jones' death was a covered accident under the Policy, a burden she cannot overcome, and in any event Defendant meets its burden to show that the Illness Exclusion applies.

Defendant relies on the opinions of Dr. Shadrach Jones, an in-house medical director for LINA, and Dr. Scott Denton, a board certified forensic pathologist who performed an independent review of the claim file, including the records from Mexico. Both doctors opined that Mr. Jones did not die from a pulmonary embolism resulting from the surgery; rather, they concluded that based on the circumstances and medical history, Mr. Jones' heart condition was

8

the primary cause of death.[5] Defendant claims that the facts presented here satisfy the "substantial contribution" test articulated in *Dixon*, such that the decision to deny benefits should be upheld. It urges the weight of the medical evidence supports LINA's conclusion. As for evidence from Plaintiff, it urges that the opinion of Mr. Jones' former nephrologist Dr. Wehrum is unsupported, and Plaintiff's retained expert, Dr. Schultz, relies on "but-for" causation or a "chain of events" theory rather than addressing the applicable substantial contribution test. Finally, Defendant makes brief argument that the Illness Exclusion bars coverage because LINA staff physician Dr. Jones, independent forensic pathologist Dr. Denton, and Dr. Dario Valdez-Mendez, who certified Mr. Jones's death, all agree that systemic arterial hypertension was a cause of Mr. Jones' death.

Both parties have filed their respective responses and replies to the motions for summary judgment, which essentially reiterate the arguments made in the cross-motions. In brief, the parties dispute the interpretations of the case law and the proper application of the "substantial contribution" test.

---

[5]LINA points to the medical records detailing his medical history of severe heart disease. Among other things, it notes that Mr. Jones was a 72-year-old former smoker who weighed 286 pounds at his death (R. 167-68), had been diagnosed with chronic severe cardiomyopathy (R. 151, 167), chronic atrial fibrillation (R. 152, 163) and associated tachycardia, (R. 164, 172), hypertension (R. 152, 163, 166), and chronic systolic heart failure. (R. 165). During a doctor's visit nine days before his death, Mr. Jones exhibited labored breathing on exertion and was taking three cardiac medications. (R. 152). The death certificate listed pulmonary embolism as the cause of death, which was a consequence of systemic arterial hypertension, and provided that the facial trauma was reported as significant pathological states that contributed to the death but are unrelated to the morbid state that caused it. (R. 372).

9

**Summary of the Evidence**

The parties agree that Mr. Jones had a long history of cardiac/heart disease. On October 1, 2015, six days before traveling to Mexico, Mr. Jones visited his cardiologist. (R. 163). She noted a history of "hypertension, atrial fibrillation, and cardiomyopathy;" "no chest pain, lightheadedness, or other concerning symptoms;" and "dyspnea on exertion." (R. 163–64). She found improvement in his cardiomyopathy, atrial fibrillation rate controlled on medication, and hypertension well-controlled. (R. 164).

It is also undisputed that Mr. Jones suffered a traumatic fall on October 7, 2015, causing multiple bone fractures in his face which necessitated reconstructive surgery. While surgery appeared to go well, approximately two days after the surgery, Mr. Jones suffered cardiac arrest and died.

A Death Certificate was prepared and certified by Dr. Dario Valdez-Mendez. (R. 372). The Death Certificate listed "pulmonary thromboembolism" caused by "systemic arterial hypertension" as the "illness, lesion or pathological state that directly led to death." "Facial trauma" was identified as "other significant pathological state that contributed to the death but are unrelated to the morbid state that caused it." (R. 381, translated at R. 372).

Mr. Jones' remains were returned to the United States, and no autopsy or cremation was performed. (R. 362, 373).

Upon receipt of Mrs. Jones' claim for accidental death benefits, in-house medical director for LINA, Dr. Shadrach Jones conducted an initial review. On December 2, 2015, Dr. Jones opined as follows:

> The records on file do not support that decedent's death was the direct result of injuries. The claimant fell traumatizing his facial

> bones. The decedent did not die from this incident. CT scan of the brain did not show intracranial hemorrhage. A rhinoplasty was performed one day after the facial bone fracture and the decedent died suddenly and unexpectedly 2 days later. No autopsy was performed. The death was attributed to pulmonary embolism (PE) and not the facial trauma. The decedent had multiple risk factors for venous thromboembolic disease (VTE) including age, international air travel, and prior heart disease. Major surgery with general anesthesia lasting more than 30 minutes and prolonged immobilization are also risk factors for VTE, but details of decedent's surgery are not on file. The greatest risk of post-operative VTE is with lower extremity surgery. Post-operative PE are usually present 7 to 10 days after surgery, peak around 3 weeks, and the elevated risk persists for 10 to 12 weeks. Therefore it would be unusual for a PE to occur 2 days after surgery, and the claimant had pre-existing risk factors for the PE.
> Other possible causes of sudden death in this individual include arrhythmia and stroke from atrial fibrillation.
> None of these medical conditions is directly attributable to the facial trauma sustained on 10/7/15. Stated to a reasonable degree of medical certainty and based on the information contained within the claim file, the decedent's death was due to illness, disease or bodily infirmity.

(R. 348–349).

On February 9, 2016, at LINA's request, forensic pathologist Dr. Scott Denton issued a report. (R. 150–53). Dr. Denton opined "that the medical history and medical records most strongly support the underlying cardiomyopathy hypertensive cardiovascular disease cause of death listed on the death certificate, rather than the initially listed cause of pulmonary thromboembolism." (R. 151). Dr. Denton believed that death from pulmonary thromboembolism was "unlikely," but that if Mr. Jones did have a pulmonary embolism, it would be "unrelated to the fall and surgery" and "most likely related to his morbid obesity, atrial fibrillation,

11

cardiomyopathy-hypertensive heart disease, and long airplane flight..."[6] *Id.* He stated further, "I cannot find any pathological connection between his fall and fractured nose in Mexico and his subsequent sudden natural death in the hospital the day after nasal surgery, beyond the injury causing physiologic stress to a diseased heart." *Id.* In discounting thromboembolism as the cause of death, he explained:

> Sudden death from pulmonary thromboembolism two days after surgery is very unlikely and two days is not enough time for the deep vein clots to form, expand upward, break free, and flow into the lungs. Post-operative fatal pulmonary thromboembolism is much more likely to occur approximately 7 to 21 days following surgery in my experience, and much more likely when the surgery involves the mid to lower leg, such as the ankle or knee. There was also no skull or brain injury from the fall clinically or in the radiologic scans to link any facial injury to his death. It is likely that the fall with the nasal bone fracture and subsequent surgery was a stressful event, but one could not argue that the fall injury caused death by itself, without his severe underlying natural cardiomyopathy hypertensive heart disease.

(R. 153).

He concluded: "[Mr. Jones'] severe underlying preexisting cardiomyopathy hypertensive heart disease is the primary and most reasonable cause of his death, and the fall-related injury with subsequent surgery was a traumatic physiologic stressful event upon his heart." (R. 153).

LINA denied the claim by way of a letter dated February 16, 2016, quoting heavily from Dr. Denton's report. (R. 142–146). LINA concluded, "Given that Norman Jones' death was not a direct result of the fractures of his nose, but was primarily caused by complications of his chronic heart disease, the loss is not compensable under this policy." (R. 145).

---

[6]This doctor incorrectly assumed that Mr. Jones had traveled from Florida to California and then to Mexico, when in fact the record showed he flew from Tampa, Florida, to Monterrey, Mexico, to Mexico City. (*See* R. 256).

On appeal to LINA, Plaintiff's counsel supplied additional medical records, information, pictures, and the video surveillance from the hotel lobby, as well as a letter from the Mr. Jones' nephrologist Henry L. Wehrum, D.O., and a report from Dr. Daniel Shultz, who (like Dr. Denton) is a board certified forensic pathologist. (R. 93–128; R. 39–43).

Dr. Wehrum's one-page letter dated April 9, 2016, was brief, explaining that he had reviewed the Death Certificate and a number of medical records relating to his hospitalization in Mexico, and had participated in Mr. Jones' care for a number of years for hypertension and CKD3 [stage 3 chronic kidney disease]. (R. 78). As for these conditions, he opined, "[t]hese conditions most certainly did not lead to his death in October of 2015." *Id.* In his view, "Mr. Jones' death was accidental and not related to his preexisting medical conditions." *Id.*

On July 11, 2016, Dr. Schultz provided his opinion that the fall/impact/injury led to hospitalization/surgery which led to death, "which makes this an accident." (R. 24). Dr. Schultz opined, "But for the fall, it is unlikely that he would have arrested on this point in time. The fall/injury started the chain of events and most reasonably caused his ultimate death." (R. 26). This doctor surmised, "Indeed he had other underlying comorbidities, but it is the traumatic event which is best characterized as the actual cause of the death on this day and thus the manner." *Id.* He stated, "If not for this new traumatic event, it is unlikely that he would have died at this moment but for the trauma." *Id.* In contrast to Dr. Denton's opinion, while Dr. Shultz conceded that it is impossible to conclusively determine if an individual had a pulmonary embolism without an autopsy, pulmonary emboli are possible and "can in fact develop in a few days such as this." He explained:

> Stress is in the very least indisputable condition here and it was significant enough to burden various body systems, particularly

13

> the heart. It is reasonable to suggest that a pulmonary embolism is a likely consequence, and that includes the formation of such in a three day interval. Any suggestion that forming a deep leg vein thrombus large enough to cause a pulmonary embolism of clinical significance in only a few days (i.e. 2-3 in this instance) is simply not true. Indeed, 1-3 days is within the realm of what I have seen over the years. The timing of such in various individuals post-trauma/post-surgery is just that, variable, but this timeline is not at all unusual. Such embolic events as complications in Mr. Jones's scenario [ ] are in fact some of the first I would opine.

(R. 25).

By Dr. Shultz's reading, LINA's expert Dr. Denton agreed that the cause of death was accidental. (R. 24–25).[7] Finally, Dr. Schultz added, the facial fractures and stress Mr. Jones' suffered were severe and "[e]ven a perfectly healthy individual with no underlying cardiovascular disease could have succumbed to the variety of post-traumatic complications I have already raised, but this man was additionally vulnerable to these effects. Being vulnerable, however, should not negate the seriousness of these injuries" and "as we look at proximate cause/manner, this is an accidental manner due to the complications of the proximate facial injuries." (R. 26).

LINA's expert Dr. Denton provided a follow-up to his report on August 17, 2016, but did not alter his conclusion. (R. 13–14).[8]

---

[7]Dr. Shultz noted, "I should add, and would agree (in points related to causality of the death by trauma) in the words of Dr. Denton: 'The fall-related nasal bone fracture and subsequent surgery likely caused physiologic stress upon his severe underlying heart disease. Based upon this minor contributory injury-related stress, the manner of death is by convention certified as an accident in forensic pathology.'" (R. 26, quoting R. 151).

[8]Dr. Denton's supplemental report is not included in the record, but is apparently quoted in LINA's denial of the appeal.

On August 25, 2016, LINA denied the appeal maintaining its original decision to deny the claim. (R. 6–16). It determined that Mr. Jones' death was not a covered loss under the policy and/or that the loss was specifically excluded by the policy. (R. 14).

## IV.

## Analysis

ERISA authorizes a plan participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). A plaintiff suing under this provision bears the burden of proving his entitlement to contractual benefits; however, if an insurer claims that a specific policy exclusion applies to deny the insured benefits, then the insurer must generally prove the exclusion prevents coverage. *See Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (citing *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992)); *see also Prelutsky v. Greater Ga. Life Ins. Co.*, 692 F. App'x 969, 972 (11th Cir. June 2, 2017) (internal quotation marks omitted).

The gravamen of this case centers on the ERISA policy language requiring a claimant's accidental loss be "<u>a direct result of the injuries, and from no other cause</u>..." and an exclusion provision stating that benefits were not payable "for loss caused by or resulting from illness, disease, or bodily infirmity." (*See* R. 428–29) (emphasis added). As set forth above, Plaintiff claims the loss was the direct result of the fall and facial injuries and his heart conditions played no (or only a de minimis) role. In contrast, Defendant claims the preexisting heart issues were the primary cause of death such that this was not a covered loss or that the loss was otherwise excluded.

15

In the context of accidental death claims, the Eleventh Circuit first addressed "the issue of whether, and to what extent, language in an ERISA policy may preclude recovery for accidental injury where some preexisting condition was a contributing factor" in *Dixon*, 389 F.3d at 1183.[9] In answering the question, the Court adopted the reasoning and standard announced by the Fourth Circuit which provides that "preexisting illness or infirmity is not to be considered as a cause unless it substantially contributed to the disability or loss. *Dixon*, 389 F.3d at 1184 (citing *Adkins v. Reliance Std. Life Ins. Co.*, 917 F.2d 794, 797 (4th Cir. 1990).[10] Similarly to the Fourth Circuit, the Court reasoned:

> [A]n overly strict interpretation of "directly and from no other causes" would provide insureds, or their beneficiaries, with coverage only where the insured was in perfect health at the time of an accident. The "substantially contributed" test gives this exclusionary language reasonable content without unreasonably limiting coverage. And, it advances ERISA's purpose to promote the interests of employees and their beneficiaries.

*Id.*

Under the substantially contributed test as adopted, the trial court conducts a two-step inquiry: first, whether there is a pre-existing disease, pre-disposition, or susceptibility to injury,

---

[9]The policy language at issue in Dixon provided coverage for loss from bodily injuries caused by an accident which "directly and from no other causes" resulted in a covered loss. The policy also contained an exclusion that no benefits would be paid "for loss resulting from sickness, disease, or bodily infirmity." *Dixon* at 1180. The policy language in *Dixon* is nearly identical to the language presented here.

[10]In *Dixon,* the insured was in a single-car accident right before his death, which caused emotional and physiological stress (but no external trauma or injuries) that resulted in cardiac arrest. 389 F.3d at 1181. The trial court held that the insured death did not result "directly" from the accident but rather from his pre-existing heart disease. *Id.* at 1184. Thus, it found the defendant was correct in denying benefits under the accidental death policy, which limited coverage only to those injuries resulting directly and from no other causes. *Id.*

and second, whether this pre-existing condition, pre-disposition, or susceptibility substantially contributed to the loss. *Id.*

As detailed above, there is no dispute that the record shows Mr. Jones with a history of cardiovascular problems extending more than forty years before his death. In addition, there is no dispute that Mr. Jones fell in Mexico and that, as a consequence of the fall, he suffered serious facial trauma and required reconstructive surgery as a result. The crux of the dispute though is to what extent, if any, the preexisting heart condition(s) contributed to Mr. Jones' death.

While the consequence is a harsh one, upon review and consideration, I am obliged find the decision that Mr. Jones' heart conditions substantially contributed to his death is supported by the whole of the medical evidence and the decision to find Mr. Jones' death was not a covered loss was the correct decision. By a fair reading of the whole of the medical record, while the injuries and the stress caused by the injuries sustained in the fall were contributing factors, it is apparent Mr. Jones would not have died without his long-term and significant preexisting cardiovascular condition which substantially contributed to his death.

In reaching the conclusion to deny benefits, LINA examined a well-documented history of heart problems, records from Mexico, and other records submitted by Plaintiff, and concluded that the primary cause of death was his preexisting condition. By my consideration, a primary cause is, by its plain language and meaning, a substantial cause. Indeed, no doctor (except a brief, entirely conclusory opinion from Mr. Jones' nephrologist Henry L. Wehrum), opined that his heart condition did not contribute to his death. While Plaintiff's expert Dr. Schultz attempts to explain the fall as a "but-for" cause of Mr. Jones' death, even by his assessment the fall and facial injuries resulted in physiologic/psychologic stress significant enough to burden various

17

bodily systems, particularly the heart, and that Mr. Jones' preexisting conditions made him additionally vulnerable to post-traumatic complications. While he would find the manner of death accidental and unnatural according to forensic pathology conventions, his opinion employs a but-for analysis and sidesteps a clear statement on the extent to which the preexisting conditions contributed to Mr. Jones' cardiac arrest.

Plaintiff's efforts to achieve a different result by distinguishing *Dixon* and citation to other case law on the basis that Mr. Jones suffered a traumatic event prior to his death are unavailing. By a fair reading, the substantial contribution test under *Dixon* does not depend on there being no external trauma or physiologic stress prior to death. Rather, the test focuses on the significance of the pre-existing disease or susceptibility and its contribution to the loss, whether there exists external trauma or not. Plaintiff submits that it is "rank speculation" to say that Mr. Jones would have died on the date and time he did without the fall (s*ee* Doc. 32 at 1), but such misses the point and by an impartial read of the record it appears more speculative to say that Mr. Jones would have died from the fall and/or surgery absent a contributing heart disease.

In short, the administrative record supports the conclusion that Mr. Jones' preexisting history of heart problems "substantially contributed" to his death. While there are differing opinions on the cause of the cardiac arrest, the record on the whole supports that Mr. Jones' history of cardiac issues significantly contributed to his death. As a result, I conclude LINA's decision to deny Plaintiff's claim is not wrong and the decision should be affirmed.

Because the undersigned agrees that the administrator's decision that Mr. Jones' existing medical conditions substantially contributed to his death is not wrong, it is unnecessary for the

undersigned to determine whether LINA has met its burden to show that the death qualified as an illness, disease, or bodily infirmity so as to exclude coverage under the Policy.

V.

**Conclusion**

For the foregoing reasons, I **RECOMMEND** the following:

1) **Plaintiff's Motion for Summary Judgment** (Doc. 24) be **DENIED**;

2) **Defendant's Motion for Summary Judgment** (Doc. 25) be **GRANTED**;

3) that Judgment affirming the administrative decision to deny benefits be entered with retention of jurisdiction to determine attorney's fees and costs; and

4) that the Clerk be directed to close the case.

Respectfully submitted this
15th day of November 2017.

_____
THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

Copies furnished to:
The Honorable James S. Moody, Jr., United States District Judge
Counsel of record